11 ARMSTRONG, Judge.
The defendant, Merrick Carter, was charged by bill of indictment on July 16, 1998, with second degree murder, a violation of La. R.S. 14:30.1. At his arraignment on July 29, 1998 he pleaded not guilty. Probable cause was found and the motions to suppress the identification and the statement were denied on March 19, 1999. After trial on June 15, 1999 a twelve-member jury found him guilty as charged. He was sentenced on June 21, 1999 to serve life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant’s motion for reconsideration of sentence was denied, and his motion for an appeal was granted.
This case concerns the murder of twenty-nine year old Theron Corey on May 8, 1998, just after midnight in the Melpomene Project. Ms Brenda Bell, the victim’s mother, testified at trial that she last saw her son at his girlfriend’s house in the Melpomene Project about 10:30 p.m. on May 7, 1998. She said her son had a criminal record for trespassing, possession of cocaine, and possession of a stolen car.
| {.Officer Carlos Below and his partner, Officer Melvin Williams, investigated the murder of Mr. Corey. On May 14, 1998 they interviewed the defendant in connection with another matter; at that time the defendant said he had heard of the murder but knew nothing particular about it. However, on May 17, 1998 the defendant was arrested for the murder of Theron Corey.
Detective David Gaines, who investigated the homicide, testified that when he arrived on the scene at about 12:50 a.m., *45 the victim had already been pronounced dead. The detective spoke to Ms Adrian Marshall, the victim’s girlfriend, who said that Theron Corey had left her apartment to go to the store when he was killed. Ms Sophia Washington told the detective she heard gunfire and looked out her window to see the victim on the ground, but she did not see anyone fleeing the scene. She called 911. On May 13, 1998, the detective received a phone call from someone wanting to remain anonymous who said that Merrick Carter and Eric Day were responsible for the murder of Theron Carey.[1] On May 14, 1998 the detective heard from an officer working at the Audubon Zoo that there was a witness to the crime who wished to speak to Detective Gaines. On May 16, 1998, the detective met with Lamont Bernard. Mr. Bernard said that while he was staying overnight with his sister at 2401 Thalia Street in the Melpomene Project, he walked onto the balcony to smoke a cigar. A man, walking below, looked up at him and asked if Mr. Bernard knew “Pie”; Mr. Bernard ignored the question, and the man walked on to the next breezeway. From the vantage point of the balcony, Mr. Bernard saw the man fire four or five shots at the victim.
[¡¡The detective prepared a photographic lineup, and Mr. Bernard selected Carter’s picture and named him as one of the men who shot Theron Carey. Mr. Bernard saw another man with Carter, but he never saw the man’s face and could not identify that man.
Officer Kenneth Leary, an expert in examination of firearms, testified that he examined the two spent bullets found in the courtyard where Theron Carey was murdered and also the eight spent bullets recovered during his autopsy. All the bullets were 88 caliber and from at least two different guns. Two of the eight bullets found during the autopsy were fired from the same gun, and another two were fired from a different gun. The other bullets were deformed so as to make identification impossible.
Dr. Tom Carson, an expert in forensic pathology, performed the autopsy of Theron Carey who died of eight gunshot wounds. When the victim was tested for alcohol or drugs, he was found to have ingested an anti-anxiety drug such as Valium or Xanax. Morphine was also in the victim’s system. It could have been ingested as heroin or as a legitimate therapeutic drug.
Lamont Bernard testified that he worked until about 10 p.m. at the Audubon Zoo on May 7, 1998, and then he went to his sister’s apartment at 2401 Thalia Street, Apartment F. Around midnight, he was smoking a cigar on the third floor balcony when a man walking in the courtyard asked if Bernard knew “Pie,” and Bernard ignored him. The man, later identified as Merrick Carter, was accompanied by a second man; they both walked across the ramp way toward a third person. Carter pulled out a handgun and shot the man; the second man also shot him. The shootings occurred only a few seconds after Carter had spoken to Mr. Bernard, who said he was so shocked he could not move and stood there about |4an hour. The police arrived about ten minutes after the shooting, and during the time the police were there,' Merrick Carter returned and got into a white Mustang parked to Mr. Bernard’s left. Mr. Bernard said he had never seen Merrick Carter before the night of the murder, and he did not know the victim’s identity until he came to court the first time. Mr. Bernard suffered from anxiety and sleeplessness as a result of his observations, and he told a psychiatrist and the security director at the Audubon Institute what he had seen. Eventually the security director contacted Officer *46 David Gaines. As a result of his conversations with the officer, Mr. Bernard looked at a photographic lineup and selected the picture of the defendant and named him as the man he had seen shoot the victim.
Two members of the defendant’s family testified. Mr. Quinn Carter, the defendant’s uncle, stated that the defendant was at home with him between 10 p.m. on May 7, 1998 until after 7 a.m. on May 8, 1998; they were watching a Chicago Bulls’ game on television. Under cross-examination, Mr. Quinn admitted that he has an alias of Edward Williams, and under that name he has a conviction for possession of cocaine with intent to distribute. Ms Jessica Nolan, the defendant’s cousin, testified that she too was watching a Chicago Bulls’ game on television with Merrick Carter on May 7, 1998. When the district attorney produced a newspaper from that day which indicated that a Chicago Bulls’ game was not televised then, Ms Nolan said that it must have been another team playing.
The defendant, who testified against his attorney’s recommendation, stated that he knew nothing of the murder of Theron Carey. The defendant acknowledged knowing the victim from having grown up in the neighborhood but maintained that he was at home the night that Carey was killed. The defendant admitted that he had a prior conviction for manslaughter and that he was in prison until April 11, 1998, |son that conviction. Under cross-examination, the defendant denied being a “hit” man, but he admitted that he was charged with second degree murder before he pleaded guilty to manslaughter in 1992.
In a single assignment of error the defendant argues that his sentence is excessive under State v. Dorthey, 623 So.2d 1276 (La.1993). The defendant received a life sentence without benefits as mandated by La. R.S. 14:30.1(1). The State filed a multiple bill but declared the bill moot after Carter was sentenced to life imprisonment.
A sentence is constitutionally excessive if it makes no measurable contribution to acceptable goals of punishment and is nothing more than the purposeless imposition of pain and suffering and is grossly out of proportion to the severity of the crime. State v. Dorthey, supra. A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the harm done to society, it shocks the sense of justice. State v. Baxley, 656 So.2d 973 (La.1995); State v. Lobato, 603 So.2d 739 (La.1992).
In his argument, the defendant contends that the both legislature and jurisprudence have erred in establishing the method by which a defendant can challenge his sentence. Citing State v. Johnson, 709 So.2d 672 (La.1998), the defendant argues that his burden of proof is unduly heavy in that he must rebut the presumption that the mandatory minimum sentence is constitutional. He maintains that a more equitable method of determining a fair sentence would be to require the trial court to consider the circumstances and decide on a constitutional sentence in each case.
The argument is untenable. At issue in State v. Johnson, which concerned a possession of cocaine conviction, was whether the minimum twenty year sentence | fiunder the Habitual Offender Law was excessive for a fourth felony offender with no violent offenses. In the case at bar, we have an offender convicted of second degree murder and sentenced under that statute not under the Habitual Offender Law. The argument that the special circumstances of this defendant should be scrutinized falls also because although we know only a few facts about his history, those facts serve to support the imposition of the most severe sentence. At trial the defendant admitted *47 to pleading guilty to manslaughter after being charged with second degree murder in 1992; furthermore, he was released from prison and on parole for that offense less than a month before committing this offense. While the defendant argues that his special conditions should be considered, he gives no indication of any circumstance that could offset his disastrous criminal history.
In State v. Guy, 95-0899 (La.App. 4 Cir.1/31/96), 669 So.2d 517, 526, writ denied, 679 So.2d 102 (La.1996), this Court considered a case where a defendant convicted of second degree murder argued the excessiveness of the sentence, and this Court stated:
When a trial judge determines a sentence from a carefully tailored penalty statute, such as La. R.S. 14:30.1(B), there is a strong presumption that the sentence is within constitutional parameters. Appellant has not succeeded in proving, and the record does not clearly show that under the facts of this case the trial judge abused his sentencing discretion.
Similarly, in the case at bar, we find no indication that the trial court abused his discretion in imposing the mandated sentence under La. R.S. 14:30.1.
This assignment of error is without merit.
For the foregoing reasons, the defendant’s conviction and sentence are affirmed.

AFFIRMED.

. Eric Day was murdered shortly after Theron Carey's Murder.